United States versus nationwide mutual insurance. Okay. Okay. Uh huh. We filed our reply brief in this case, and I'd like to briefly call your attention to three decisions that have come down in the interim. There was some disagreement in the briefing. Did you file letters indicating that you wanted to cite these cases today? I have not. We have a 28-J practice to do that, then we review those matters and we're more prepared for your argument. But go ahead. Let me let you proceed. There was some disagreement in the briefing about the way the Medicare secondary payer statute works. There were two decisions in August from the 11th circuit. Neither of the holdings of those cases are particularly relevant here, but they do both contain discussions of the secondary payer statute, and I think they're relevant for your consideration. That would be Humana Medical Plan versus Western Heritage Insurance Company at 832 F. 3rd, 1229. And the discussion begins at page 1233. The other is MSP Recovery versus All-State Insurance, and that's found at 835 F. 3rd, 1351. And the discussion begins at page 1358. Excuse me, yes, thank you. The third case, then, is a third circuit decision that came down in October. It reversed a district court decision that the magistrate judge in this case had relied on. That's United States XREL Customs Fraud Investigations versus Victaulic. The parties have cited that district court decision from the Eastern District of Pennsylvania in this case. The citation is 839 F. 3rd, 242. We think those cases are worthy of the court's attention. This morning, I'd like to focus my argument on the magistrate's conclusion that the relator has not adequately or plausibly pled the existence of defendant's obligations to pay money to the government. As we've alleged in the complaint, Dr. Takamoto has years of experience assisting insurance companies, including some of the defendants here, in complying with the Medicare secondary payer statute in the workers' compensation context. He built two companies and ran a third with hundreds of employees, the primary business of which was to help workers' comp carriers comply with their Medicare secondary payer obligations. Through that work, Dr. Takamoto learned that his clients didn't perform the compliance work that he and his competitors performed. The theory is that because of the numbers involved and the volume that the defendants must have failed to reimburse when they should have? That's the theory? The theory is that because the defendants wrote a large volume of liability insurance, with the exception of one accident fund, which we've addressed separately, as a mere matter of probability, the defendants likely incurred a number of obligations, because one in six in the general population are Medicare beneficiaries. Without probabilistic inferences from those numbers? Correct, Your Honor. Is that enough, that it's probable? You don't cite any specific incident of a failure to reimburse or pay? That's correct. We don't. And the fact of the matter is that if the defendants were called . . . Like saying, you know, everybody cheats on their taxes, so here are six taxpayers. They must have cheated. Well, no, it's . . . Or it's probable that they cheated. It's based on more than that. The fact that they incurred MSP obligations is highly likely, given the volume of insurance that they wrote and the number of personal injury claims that they would have paid per year, which would be in the thousands. So, if one in six of the general population is a Medicare beneficiary, then it's very highly probable . . . And if it's highly probable that they incurred the obligation, where are the allegations that they failed to pay? You know, when did they fail to pay? How much? The allegations that they failed to pay is based upon the fact that, in order to . . . These are people with a red neon flag saying, hey, this is a Medicare beneficiary. There may be a repayment obligation. Some investigation is required. Not a lot, but you have to determine whether or not the claimant is a Medicare beneficiary. You can ask. You can look at the medical records that you have that you have to look at in order to pay the claims. How could I be wrong in looking at this as a case in which you've basically sued so that you can get discovery and then maybe you'll find some and then you'll sue about those in particular? It's as if you're just hypothesizing probabilities and saying that's enough to get discovery to look for actual failures of reimbursement obligations. The reason, Your Honor, is because . . . Because on that theory, everybody could sue every insurance company in the country, couldn't they? That's true. And what makes this case different is the relator and his knowledge and what that knowledge is based on. And we have pled that knowledge. It's based on his years of experience of providing . . . That would suggest he ought to know of at least one instance where any of these companies failed to meet an obligation. And the reason that he can't know and the reason that the defendants themselves, if they were called upon to provide those particulars, they don't know is because they did not perform the investigation that they would need to know or would need to have conducted. That may be a problem, but the FCA defines obligation as a duty arising from an express or implied contractual grantor-grantee or licensor-licensee relationship from a fee-based or similar relationship or from the retention of any overpayment. That seems to contemplate individualized pleading. What am I missing there? Well, here, the allegations add up to a likelihood that the defendants incurred these obligations simply because they pay that many injury claims over the course of a year, thousands of claims over a year. They're likely . . . Why wouldn't the law say, okay, and when you've got one, come to the courthouse? Until you've got one, we don't deal in those kind of probabilities. The defendants themselves . . . the whole . . . the gravamen of the complaint here is that the defendants themselves buried their head in the sand. CMS, the government, has information about who it made conditional payments for. The defendants have the information about whom they made payments to. Can you tell us how frequently CMS makes these conditional payments? Very frequently. On behalf of . . . and where is that in the complaint? That I would . . . that's a very long complaint. So pardon me? Is that in the complaint? We talk about the fact that CMS does make conditional payments on behalf of Medicare beneficiaries. You're asking us to make a probabilistic inference from these numbers, and it seems to me that an important number would be, or percentage would be, the frequency with which CMS makes these conditional payments. Is that in the complaint? That is not, but . . . And is it not the conditional payments that triggers the obligations? The conditional payment . . . CMS makes payments on behalf of . . . Is it not a condition of an obligation being triggered that you have a conditional payment by CMS? The payments by CMS are made when a Medicare beneficiary needs medical services. Medicare makes sure that their treatment is paid for right away so that they get the treatment. The conditional nature of the payment is only realized down the road when it becomes apparent that there is another party who is responsible for the medical . . . for the injury. So I understand that it may be only realized down the road, but it is a necessary precondition of an obligation. Correct. And that is the gravamen of the complaint here, which is that the defendants . . . I'll just put that out there . . . of the cases, wouldn't that be a problem? As a matter of a probabilistic inference? That would be a problem. You're asking us to rely on a 17% number. That would be a problem, but Your Honor, that specific point is something that we could address if we were given leave to replete, because that specific point is not a point that the defendants have raised. There's no real question that CMS pays . . . Medicare pays for its beneficiaries when they need medical treatment. They do it right up front, especially in cases involving injuries like this where there's going to be a dispute about liability and coverage. CMS doesn't wait to pay Medicare beneficiaries claims in those. So that's simply not been an issue up to this point, and I would request that if that's the problem with the pleading, we be given leave to replead. Thank you. I know you want to reserve some time for rebuttal, so let's hear from your adversary. Good morning. May it please the Court. Bryce Friedman, Simpson-Thatcher & Bartlett, arguing for the defendants. I think the Court is correct to focus on the lack of an obligation pled in the complaint. 3729A1G requires plaintiffs to prove each defendant had an actual obligation to pay money to the government. The Court focused and asked my colleague about the statistics. The entirety of his complaint and his appeal rests on paragraph 69 of the complaint. That's the 17% figure. That is the 17% number, correct. And what we did not cite in our brief, and perhaps we should have, is this Court's decision in Burgess v. New York City Department of Sanitation, 793F363 from 2015, in which the Court addresses the use of statistics in pleading a complaint. And that was a employment discrimination case. But what this Court said was the statistics have to be statistically significant and make other plausible non-discriminatory explanations for the conduct unlikely. So what do we have here? We have 17% of the population of the United States of America are Medicare beneficiaries. Well, according to the plaintiff's logic, you would assume that 17% of the people in this room then are Medicare beneficiaries, and obviously they're not. You would assume that 17% of the people on the subway train I took this morning are Medicare beneficiaries, and obviously they're not. It is not a plausible inference, or even a fair inference for the Court to draw, and the Court was correct below, to not believe that, for example, 17% of the people with whom my client has business dealings are Medicare beneficiaries. And then, the next sentence of paragraph 69 is that in a small fraction of cases, not talking about what kind of cases, the beneficiary or the primary payer didn't pay CMS. There's no allegation that that small fraction applied to my client, what that number was, or as Judge Lohay was asking, that it's more than a single person. There is no information that you can gather about what my particular client did from this information. As Judge Radish said, you could make these allegations against virtually any corporation in America of any size. Of course. Go ahead. I was going to say, if I understood Mr. King's argument, though. His point is that, It's impossible to know these. An individual case, at this point. He can only hypothesize based on the statistics, and that the government doesn't care. So, at least respond to that argument for us, since it is the one that was advanced. In a False Claims Act case, you would expect, if there was an obligation, money that my client owed to the government, and Mr. King's money owed for the government, and we stuck our head in the sand with respect to that government, he would identify it. Let's talk about- How would someone in his client's position be able to identify it? He doesn't have access to your records or the government's records. The classic case that Mr. Takamoto relies on in this case, and that we hear all the time in False Claims Act cases, is the Grubbs case out of the Fifth Circuit. In which 9B was applied, and my rule 9B was applied, and the relators come into court and say, apply a relaxed standard. Well, guess what happened in that case? There was a dinner that the relator was invited to, and they said, this is how we are going to commit fraud at this hospital. These are the forms you have to fill out, these are the codes you have to change. And the next day, he went to work at the hospital, he was handed the piece of paper, and asked to engage in the fraud. That's how he would know that there are such obligations that we didn't pay. He says he worked in the company. You would expect he would be able to identify a- The problem with that, potentially, is that theory, as I understand it, doesn't rest on affirmative fraud, it really rests on deliberate ignorance. So they've developed this or created this structure pursuant to which they cannot know about any obligation. But that of course- Because they don't have a compliance program. Of course, but that assumes that there was a Medicare beneficiary in the first place who got a conditional payment, who didn't get paid. There would be an- And so maybe that's a defect, I take it. Your colleague has acknowledged in the complaint, but he says, well, let me replete. Well, let me deal with the repleting issue. On page 51 of his reply brief, he says he cannot identify a specific obligation. Even if given a chance to replete, he can't do it. So that should be the end of the replete story. As far as the sequence here in terms of the fairness of the opportunity he's had, when Mr. King came in this case, all the defendants consented to give him an opportunity to replete. He told the district court that he was going to reduce the number of defendants to cases in which he knew about obligations that went unpaid. He added defendants. Then the magistrate issued a report and recommendation. It took six months for the district court to accept that recommendation. There was no application to replete. Here we are in this court, the relator has seen all our arguments. There is no indication how he would replete to fix his complaint to identify a single obligation that he would replete. I think the district court was correct to dismiss the claim with prejudice, given the opportunities that the plaintiff has had to replete his claim already and has failed to do so knowing all the arguments and the decision. And I think that it would be perfectly appropriate to affirm the dismissal with prejudice. The one other thing I would like to mention is this court's review is de novo. And I think it's important that this court state that rule 9B unequivocally applies to false claims act cases. Even false claims act cases brought alleging knowing and improper avoidance of an obligation. Your argument doesn't rest. It does not. You just want us to say it. Absolutely, I think the issue is before the court. You should indicate what standard you're applying to review it, and I think it fails under 8A or 9B, but I think it would be appropriate to do so. And I would add that the customs fraud case in which Mr. King raised to this court, which reversed one of the cases cited in our brief, was a third circuit decision from a few months ago. And it absolutely applied rule 9B to a 3729A1G claim, just like the one in this case. The Olson decision that we did write a 28J letter on to this court did apply rule 9B to this case. There is not a single court other than the magistrate below that I'm aware of who's declined to analyze a false claims act 3729A1G claim under rule 9B. And if you think about it, rule 9B is perfectly appropriate to apply in this case. Common law fraud arises when somebody has a duty to speak. They do not speak, the other party relies on it to their detriment. That is exactly what the allegation is here in this complaint. Dr. Takamoto is alleging that my client had a duty to speak, failed to do it, and the government relied on that duty. That is a classic fraud claim, and there should be no doubt that rule 9B applies to the allegations in this case. The one other thing I would add in my few remaining minutes is, I would ask the court not to fall into the trap of the oversimplification of the Medicare secondary payer scheme that has been presented by Dr. Takamoto's appeal. The whole premise of his case is that on the 61st day after Medicare makes a conditional payment, and assuming Medicare did make a conditional payment to somebody who one of my client has a relationship, is that we have a duty then to pay the government on the 61st day. That could not be further from the case under the regulatory scheme. It's evidenced by the fact section 111, what's colloquially known as section 111, referenced in paragraphs 53 and 54 of the complaint, only require the defendants to report to the government once a quarter the settlement payments they've made. So if we have to report to once a quarter the settlement payments we've made, it makes absolutely no sense to suggest that on the 61st day, for some reason, we had to cut a check. And as a practical matter, there's plenty of things in the record which show essentially that we have no potential duty to pay until we receive a recovery demand letter. And that's how he would plead a claim if he knew it. If we had a letter in our files that said, we paid $100 for this item or service, Medicare did. And you paid $100 for that item or service, you must reimburse us. There's not even an attempt to plead that such a thing exists. And that's the way the regulatory scheme works in real life. And the recovery letter is referenced at 42 CFR 41122. Do you agree with me, just hypothetically, just so you understand where I'm coming from, that if the allegation had been, instead of a total of 17%, a total of 95%, that that would be the end of the story? You wouldn't at least be making some of the arguments you've made to us, is that correct? I couldn't agree with that as a matter of pleading, because that doesn't tell me that my client, 95% of the, let's call them customers, although they're not- There is some cliff over which you might agree that, at least with respect to paragraph 69 of the complaint, that might have sufficed to make the requisite probabilistic inference. I always hate to be asked how my adversary should plead a complaint that works. But I will tell you, there is a potential complaint out there in the world that works. The government brings cases under the Medicare Secondary Payer Act all the time. And the case books are filled with them. So those are cases that are pledged. The government has got access to a little bit more information. Even at 95%, even at 97%, there's still the question of whether your client happens not to reimburse when he's supposed to. Maybe my client just reimburses, I deal with all summer camps and kids, or schools and kids. And I never have to deal with a Medicare beneficiary in settling a claim. Like, this is a complaint against my client, not against the world, not against the fact that there may be unpaid Medicare secondary payments out there. It's about my clients, and there's literally nothing about my clients or their business in this particular complaint. Thank you. Can you reserve some time? Thank you, Your Honor. The allegation that 17% of the population are Medicare beneficiaries does not mean that in a room of this number of people, that 17% of the people here are Medicare beneficiaries. For a number of reasons, but one of which is simply the number behind me. The number of claims that the defendants pay each year is in the thousands. That is a much different inference to be drawn in that situation. And they're not people that my colleagues' clients do business with in the sense that they take out insurance from them. They are random people who have been injured and make tort claims for which his clients then make a payment. What's the basis, though, for alleging that of those thousands of people whom they insure, they're not reimbursing on Medicare payments? Because, A, we know that they've been injured, and therefore needed some sort of a- Who's been injured? That the claimant who they have paid has been injured, they had medical treatment. And they did a Medicare payment, what is your basis for saying that they're not making the reimbursement that they're supposed to? My client built two companies and ran a third on that fact. No one would need his services if Medicare beneficiaries were repaying the government, because that would extinguish the claims. Did any of his business dealings show that this particular defendant wasn't making the reimbursement? See, that's the problem. They didn't have compliance programs in place, which makes it impossible when you're paying thousands of claims. You have to be able to identify on which claims involve Medicare beneficiaries on whose behalf Medicare has made payments. Your theory is that they necessarily must have at some level, given the 17%, and given the lack of a compliance program. They don't know, but 17% tells us that they must have an obligation. That's right. Or that there's a high likelihood of an obligation. That's right. The fact that the government brings Medicare secondary payer claims is different than in this case. In this kind of a case, the government doesn't know of the existence of the primary payer unless somebody tells the government that a payment has been made. In these key TAM, part of the job is to try to get the government interested in supporting your claim. Yes. And that didn't happen here. That did not happen here. And there was an effort to solicit the government and to get its backing or support, correct? Well, you're required to file the case under seal, and the government does an investigation and makes a determination whether or not to intervene. But the case law is also clear that a decision not to intervene is not to be interpreted as some comment on merits. I'm just interested, so and how long was that process for you? This case was filed in 2010, I believe, and it was in 2012 unsealed. Your time is up, but I do want to just make sure I understood your answer to my immediate previous question. You're relying on the percentages to say that it's probable they have a reimbursement obligation, right? Yes. And what are you relying on, that they are not complying with their reimbursement obligations? The fact that they don't have a compliance program in place to do it. Given the numbers of claims that are involved, you've got to have a compliance program in place. Doesn't have to be my clients, but you have to have- Any authority that the lack of a compliance program is a basis for pleading lack of compliance? It's a factual allegation, your honor, based on my client's experience in the industry. Thank you. All right, we're going to take the case under advisement.